IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MELINDA DEITER and          :
JOHN DEITER,                :
                            :
        Plaintiffs,         :
    v.                      :     3:16-CV-132
                            :     (JUDGE MARIANI)
CITY OF WILKES-BARRE, et al.,   :
                            :
        Defendants,         :
                            :
    and                     :
                            :
STELL ENTERPRISES, INC. et al., :
                            :
        Additional Defendants.  :

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiffs Melinda Deiter and John Deiter filed this action pursuant to 42 U.S.C. §

1983 alleging deprivation of property without due process of law in violation of the

Fourteenth Amendment, a taking of property without just compensation in violation of the

Fifth Amendment, seizure and destruction of property without a warrant in violation of the

Fourth Amendment, as well as a state law conversion claim. (See Plaintiffs' Amended

Complaint, Doc. 22). Presently before the Court are cross-motions for summary judgment

filed by Plaintiffs (Doc. 98) and Defendants City of Wilkes-Barre and Frank Kratz (Doc. 102).

Additional Defendants Stell Enterprises, Inc. and Robert Stella also moved for partial

summary judgment against Plaintiffs in this matter (Doc. 106), which the Court will address

in a separate opinion. For the reasons set forth below, the Court will deny the cross-motions, as there are many genuine disputes of material fact which must be resolved at trial.

## II. STATEMENT OF UNDISPUTED FACTS

Plaintiffs Melinda Deiter and John Deiter and Defendants City of Wilkes-Barre and Frank Kratz have each submitted a Statement of Undisputed Material Facts (*see* Docs. 99, 104) as to which they submit there is no genuine issue or dispute for trial. Each party has also submitted a Response (*see* Docs. 121, 112) and the following facts have been admitted.[1]

### 1. The Property

In September 2015, Plaintiff Melinda Deiter took title to a property located at 54 and 54 ½ Marlborough Avenue, Wilkes-Barre, Pennsylvania through a quit claim deed from her father, Plaintiff John Deiter. (Doc. 99, at ¶ 1; Doc. 104 at ¶ 15). Ms. Deiter's ownership arose from an agreement with her father, wherein she would pay $8,478.14 in delinquent real estate taxes on his behalf in exchange for ownership of the property, and she would allow him to live there free of rent. (Doc. 104 at ¶¶ 9, 10).

---

[1] Facts deemed undisputed include those which the opposing party has admitted from each Statement of Undisputed Material Facts. Statements that are admitted in part or were admitted with a qualification are only included in this section to the extent they were admitted.

To the extent that denials do not have a basis for denial in the record or merely disagree with a statement in an individual's properly quoted testimony, the Court will deem those asserted facts as admitted, and, where relevant, has included them in the statement of undisputed facts.

The dimensions of the property are thirty-seven and one-half feet (37.5') wide by one hundred thirty-two and eighty-eight tenth feet (132.88') long, and the parcel contains four thousand nine hundred and eighty-three square feet (4,983 sq. ft.) of surface. (Doc. 104 at ¶ 4). Prior to the fire and subsequent demolition, the property contained a double block, side-by-side residential home. (*Id.* at ¶ 2). The structure of the home was a two story, wood frame structure with asphalt shingles over wood decking. (*Id.* at ¶ 3). Before it was demolished, the double block home had an assessed value of $72,900. (Doc. 99 at ¶ 48).

After Ms. Deiter took title to the property, Mr. Deiter continued to live on the 54 side of the double block home while the 54 ½ side remained vacant. (Doc. 104 at ¶¶ 23, 24; Doc. 99 at ¶ 4). Ms. Detier intended to rent the 54 ½ side of the house. (Doc. 99 at ¶ 5).

The outside of the property "looked terrible" as the front porch was in bad shape and in need of repair and the roof was older and needed to be replaced. (Doc. 104 at ¶ 16). To prepare for renting, Ms. Deiter had the interior of the 54 ½ side of the house evaluated for remodeling, purchased materials for the remodeling project, and hired workers for the interior remodeling. (Doc. 99 at ¶ 5). Richard Zimmerman, Ms. Deiter's lifelong friend, planned to help Ms. Deiter remodel the 54 ½ side of the home, as he had extensive first-hand experience in home reconstruction and carpentry. (*Id.* at ¶ 6).

### 2. The Fire

On Sunday, November 15, 2015, Mr. Zimmerman was working on the 54 ½ side of Ms. Deiter's property. (Doc. 104 at ¶ 28). On that day, Mr. Zimmerman was measuring for

3

plumbing pipes and wiring because the copper pipes were stolen, and wires were missing from the breaker panel. (*Id*. at ¶ 30). Mr. Zimmerman was the only person working on the 54 ½ side of the home at the time. (*Id*. at ¶ 29).

While he was working, Mr. Zimmerman was smoking inside the home and extinguishing his cigarettes on the concrete floor near the furnace and electrical panel. (*Id*. at ¶¶ 31, 32). Mr. Zimmerman ran out of cigarettes, so he left the property and went to Turkey Hill to buy more. During this trip, Mr. Zimmerman also went to Lowe's to buy PVC pipes. (*Id*. at ¶ 33).

When Mr. Zimmerman returned to the property, he discovered that the rear porch of the 54 ½ side of the double block home was on fire. (*Id*. at ¶ 34). Mr. Zimmerman was not able to extinguish the fire himself. (*Id*. at ¶ 36).

The City of Wilkes-Barre Fire Department was called, who later extinguished the fire. (Doc. 104 at ¶ 37; Doc. 99 at ¶ 7). City of Wilkes-Barre Assistant Fire Chief John Ostrum noted in his report that the firefighters were able to get control of the fire, which prevented it from spreading to the other side of the double block. (Doc. 99 at ¶ 9).

When Ms. Deiter arrived at the scene, she identified herself to the Fire Department as the owner of the property and provided her phone number. (*Id*. at ¶ 10).

### 3. Inspections of the Property After the Fire

On Sunday, November 15 and Monday, November 16, 2015, an origin and cause investigation was conducted by Assistant Chief Fire Inspector/Investigator William A.

4

Sharksnas of the City of Wilkes-Barre Fire Department. (Doc. 104 at ¶ 44). Assistant Chief

Sharksnas concluded that the cause of the fire was incendiary, meaning the fire was

deliberately ignited. (*Id*. at ¶ 45). Assistant Chief Sharksas observed that the fire reached

the ceiling of the rear porch of the 54 ½ side of the property. (*Id*. at ¶ 46). He also

observed that the fire had burned through the ceiling and flooring into the second-floor

space above the porch while burning the exterior. (*Id*. at ¶ 46). Assistant Chief Sharksnas

further observed extensive damage to the first and second floor of the northeast corner of

the 54 ½ side of the property, and that the fire damage had extended into the eaves. (*Id*. at

¶ 47). He noted in his report that the fire caused possible structural damage. (*Id*. at ¶ 46).

After the fire was extinguished, Mr. Zimmerman was told by the Fire Department that

he was not allowed back on the property until after the fire investigation was completed.

(Doc. 99 at ¶ 40). However, at some point after the fire, Mr. Zimmerman and Ms. Deiter

looked at the property from the alleyway behind the home, from the sidewalk, and from the

neighbor's yard, which is approximately twelve feet from the property. From this vantage

point, Mr. Zimmerman was able to see the floor joists on the first and second floors and the

wall studs. (*Id*. at ¶ 40).

Based on his view of the home, Mr. Zimmerman believed the house was structurally

sound, as not one structural support beam was one hundred percent compromised. (*Id*. at

¶ 41). Mr. Zimmerman observed that the structural support beams "took some level of

damage" but "nowhere near enough damage that the structure was in danger of collapsing."

(*Id*).  Mr. Zimmerman also believed that the cost of supplies "to repair a couple of the support beams and then some plywood, [and] siding" would be approximately $5,000.  (*Id.* at ¶ 43).

On Tuesday, November 17, 2015, Ms. Deiter went into the house to retrieve her father's medications.  (*Id.* at ¶ 44).  At this time, Ms. Deiter saw no damage to the side of the house where her father lived, and everything was intact.  (*Id.* at ¶ 44).

Although the timing is disputed, the parties agree that Vincent A. Griffin, P.E. of E.D. Pons and Associates, Inc. performed an evaluation of the fire damage.  (Doc. 104 at ¶ 52; *see* Doc. 121 at ¶ 51).  On November 18, 2015, Mr. Griffin provided Defendant Frank Kratz with a written structural engineering report regarding his conclusion as to Ms. Deiter's property.  (Doc. 104 at ¶ 65; *see* Doc. 121 at ¶ 65).  In his report, Mr. Griffin found as follows:

> There is significant structural damage to the back half of the structure.  The second-floor framing and the supporting members in this area are almost completely destroyed.  Portions of the roof structure were also damaged by the fire.  There are large openings in the roof framing and significant portions of the ceiling have collapsed.  The floor and roof framing in the back portion of the house are unstable and unsafe for people to enter.  Due to the structure's proximity to the neighboring residences a partial collapse of the back portion of the structure may injure the inhabitants of the neighboring property.  There was no observed fire damage on the south side of the double block home.  However, due to the construction of the building a partial collapse or partial removal of the north half of the double block would create an unstable condition on the south side.

(Doc. 104 ¶ 54).

In his report, Mr. Griffin recommended as follows:

The above referenced building is structurally unsafe for any form of occupancy. There is a risk of a partial collapse of the building and it is not safe for anyone to enter. As a result of the above conditions of this building and its surroundings, I highly recommend that the building be condemned for demolition.

(Id. at ¶ 55).

### 4. Demolition of the Double Block Home

In November of 2015, Mr. Kratz served as a Code Official/Code Enforcement Officer for the City of Wilkes-Barre. (Id. at ¶ 48). Through this role, Mr. Kratz had full authority within the City of Wilkes-Barre to deem property unsafe and to call for its demolition. (Doc. 99 at ¶ 11). Before authorizing such demolition, Mr. Kratz was required to confirm with the Fire Inspector that the Fire Department had concluded its investigation into the cause of the fire. (Id. at ¶ 12).

On November 15, 2015, Mr. Kratz was directed by his boss, Butch Frati, to check the fire damage to Ms. Deiter's property first thing on Monday, November 16, 2015. (Doc. 104 ¶ 49). While it is disputed whether Mr. Kratz "inspected" Ms. Deiter's property, the parties agree that Mr. Kratz visited the property at some point after the November 15, 2015 fire and before the November 18, 2015 demolition. (See Doc. 104 at ¶ 50; Doc. 121 at ¶ 50).

On November 16, 2015, Brdaric Excavating, Inc. submitted a proposal in the amount of $19,700.00 to demolish Ms. Deiter's property. (Doc. 104 at ¶ 62). On the same day, Stell Enterprises, Inc. also submitted a proposal in the amount of $18,900.00 to demolish the property. (Id. at ¶ 63). On November 17, 2015 at 2:59 p.m., Mr. Kratz authorized an

email to be sent to Stell Enterprises, Inc. notifying it to proceed with the demolition of the property the following day, November 18, 2015. (Doc. 104 at ¶ 64; Doc. 99 at ¶ 29).

On November 18, 2015, Stell Enterprises, Inc. demolished Ms. Deiter's double block home. (Doc. 104 at ¶ 66). Mr. Kratz never spoke to or attempted to speak to Wilkes-Barre Fire Chief Jay Delaney. (Doc. 99 at ¶ 31). Mr. Kratz also never informed Ms. Deiter that the home was going to be demolished in advance. (Doc. 99 at ¶ 32; Doc. 112 at ¶ 32).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,… [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is necessary.[2]

## IV. ANALYSIS

Plaintiffs and Defendants have filed cross-motions for summary judgment. Plaintiffs assert that they are entitled to summary judgment on all claims alleged in their Amended Complaint.[3] (*See* Docs. 98, 101). Defendants submit their Motion for Summary Judgment

---

[2] *See Guidotti v. Legal Helps Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013):

> Under Rule 56, . . . a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party asserting that there is a genuine dispute of material fact must support that assertion by "citing to particular parts of ... the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations..., admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

716 F.3d at 772. *See also, Doebblers' Penn. Hybrids, Inc. v. Doebbler*, 442 F.3d 812, 820 (3d Cir. 2006)(stating that credibility determinations "are inappropriate to the legal conclusions necessary to a ruling on summary judgment. . . .A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."); *J.F. Feeser, Inc v. Serv-A-Portion, Inc.*, 909 F.2d 1254, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the function of the Judge; instead the non-movant's evidence must be credited at this stage.").

[3] Plaintiffs also put forward an argument in their Brief in Support of their Motion for Summary Judgment alleging a Fifth Amendment taking, which was not specifically named in their Amended Complaint (Doc. 22). However, the facts and pleadings alleging a violation of their Fourteenth Amendment rights are sufficient to support a claim of taking in violation of the Fifth Amendment, which is incorporated to the states through the Fourteenth Amendment. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897), prohibits the government from taking private property for public use without just compensation.")

"challenging the amended complaint (Doc. 22) of Plaintiffs." (Doc. 102 at 1). In their

Proposed Order, Defendants seek dismissal of Plaintiff's claims alleging violations of the

Fourth Amendment, Fifth Amendment and Fourteenth Amendment. (Doc. 102-2 at 1).

Upon review of the statements of facts submitted by Plaintiffs and Defendants, the

record contains several material factual disputes that go to the core of each claim alleged in

Plaintiff's Amended Complaint. Thus, both motions for summary judgment will be denied.

## A. Procedural Due Process Claim

Plaintiffs assert that Defendants City of Wilkes-Barre and Frank Kratz deprived

Plaintiffs of their property without due process of law in violation of the Fourteenth

Amendment to the United States Constitution.[4] (Plaintiffs' Brief in Support of Motion for

Summary Judgment, Doc. 101 at 5). Plaintiffs' claimed constitutional deprivations are

brought under 42 U.S.C. § 1983 which states in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C.A. § 1983. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that

"(1) ... the conduct complained of was committed by a person acting under color of state law

---

[4] Ms. Deiter held title to the double block home at 54 and 54 ½ Marlborough Ave. (Doc. 99 at ¶ 1), while Mr. Deiter lived in and kept his personal belongings in the 54 side of the home at the time it was demolished. (Melinda Deiter Dep. at 34:13-15, 43:2-4).

and (2) ... [that] the conduct deprived the complainant of rights secured under the Constitution or federal law." *Sameric Corp. v. City of Philadelphia,* 142 F.3d 582, 590 (3d Cir.1988). The parties do not dispute that Frank Kratz is a state actor for purposes of a § 1983 action.

Plaintiffs argue that Defendants violated their rights to procedural due process through the demolition of Ms. Deiter's home in two ways: first, by failing to provide Plaintiffs with pre-deprivation notice, and second, by failing to provide Plaintiffs a post-deprivation hearing. (*See* Doc. 101 at 6). Conversely, Defendants claim that they are entitled to summary judgment on Plaintiffs' procedural due process claim, arguing that Plaintiff's claim fails on three bases: (1) a pre-deprivation hearing was not required under the circumstances presented, (2) post-deprivation remedies were available to Ms. Deiter, and (3) Ms. Deiter's pre-deprivation procedural due process claim is barred by the more specific provision rule.[5] (*See* Doc. 103 at 19–33).

---

[5] Defendants' argument regarding the application of the "more-specific-provision" rule to Plaintiff's procedural due process claim is without merit. The more-specific-provision rule arising from *Graham v. Connor,* 490 U.S. 386, 394 (1989) "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 529 U.S. 259, 272 n.7 (1997). Thus, this rule is potentially applicable to claims seeking application of substantive due process analysis, not procedural due process claims. Moreover, Defendant cites to numerous Third Circuit opinions addressing valid procedural due process claims that are precisely on point with the facts of this case, none of which contain application of the more-specific-provision rule. *See Elsmere Park Club, L.P. v. Town of Elsmere,* 542 F.3d 412 (3d Cir. 2008) (holding that the Town of Elsmere did not violate an owner's procedural due process rights by invoking emergency procedures to condemn an apartment complex due to mold); see also *Munoz v. City of Union City,* 481 Fed. App'x 754 (3d Cir. 2012) (finding an owner's procedural due process rights were not violated by the City of Union City ordering an emergency demolition of the owner's fire-damaged home).

The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas, & Water Div. v. Craft*, 436 U.S. 1, 9 (1978). "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998). "As such, the focus in procedural due process claims is on the adequacy of the remedial procedure, and not on the government's actual actions that allegedly deprived the individual of his liberty or property interest." *K.S.S. v. Montgomery Cty. Bd. of Comm'rs*, 871 F. Supp. 2d 389, 397-98 (E.D. Pa. 2012). "Due Process is flexible and calls for such procedural protection as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 324 (1976).

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (internal citation and quotation marks omitted). Thus, "[a] procedural due process claim is subject to a two-stage inquiry: (1) whether the plaintiff has a property interest protected by procedural due process, and (2)

what procedures constitute due process of law." *Schmidt v. Creedon,* 639 F.3d 587, 595

(3d Cir.2011) (internal citation and quotation marks omitted). Here, it is undisputed that

Plaintiffs had a property interest in the double-block home and personal belongings

contained within when Defendants ordered its demolition. The Court's inquiry is therefore

focused on the second prong of the analysis.

"In the typical situation, the hearing should come before the Government deprives a

person of his property." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d

Cir. 2008). However, the Third Circuit has recognized that "in special circumstances, a

state may satisfy the requirements of procedural due process merely by making available

'some meaningful means by which to assess the propriety of the State's action at some time

after the initial taking." *Id*. (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)). Thus,

"[w]here there is 'the necessity of quick action by the State,' or where 'providing any

meaningful predeprivation process' would be impractical, the Government is relieved of the

usual obligation to provide a predeprivation hearing." *Id*.

Here, it is undisputed that Ms. Deiter received no advance notice from Mr. Kratz

regarding the demolition of her property, as is normally required by the City of Wilkes-Barre

Code of Ordinances for the removal of an unsafe building.[6] (Doc. 99 at ¶ 32; Doc. 112 at ¶

32).

---

[6] The City of Wilkes-Barre Code of Ordinances provides the following for "unsafe buildings":

In this context, the Court must first determine whether the City of Wilkes-Barre and Mr. Kratz were faced with circumstances in which they were required to provide a pre-deprivation hearing. If so, then no amount of post-deprivation process could cure the City of Wilkes-Barre's failure to provide a hearing. If no pre-deprivation hearing was required under the circumstances, the Court must then determine whether the State's post-deprivation process was sufficient. *Elsmere Park Club*, 542 F.3d at 417 (internal citations and quotations omitted) ("Our first task, then, is to determine whether the Town was faced with circumstances in which it was required to provide a predeprivation hearing. If so, then no amount of postdeprivation process could cure the Town's initial failure to provide a hearing.

---

(a) *Removal or repair of buildings.* Whenever any building, structure or part thereof or appurtenances thereto shall have been declared dangerous or unsafe by the building inspector or his designee or the fire inspector, the building shall, unless made safe and so certified by the building inspector, be demolished, taken down or removed.

(b) *Notice of unsafe buildings.*

(1) Upon receipt of information that a building or structure is dangerous or unsafe, the building inspector shall make, or cause to be made, an inspection, and if it is determined that a dangerous or unsafe condition exists, the building inspector shall serve or cause to be served upon the owner or someone of the owners, executors, administrators, agents, lessees or other person who may have a vested or contingent interest in the building a written notice describing the unsafe or dangerous condition and ordering the same to be made safe and secure or removed within five (5) working days after notice has been issued relative to the hazardous condition, as may be deemed necessary by the building inspector.

(2) If the person to whom such notice and order is addressed cannot be found after diligent search, then such notice and order shall be sent by registered mail to the last known address of such person and a copy of such notice shall be posted in a conspicuous place on the premises to which it relates. Such mailing and posting shall be deemed adequate service.

Code of Ordinances City of Wilkes-Barre, Pennsylvania, Buildings and Building Regulations, § 7-25(a-b).

If, on the other hand, the Town was faced with such exceptional circumstances that no predeprivation hearing was required, then the question becomes whether it made adequate postdeprivation procedures available to the Club").

In determining whether the State was presented with an emergency situation sufficient to justify summary administrative action, the Third Circuit has adopted a deferential approach, explaining:

> The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's exposure to dangerous condition. This quandary is exactly what these emergency procedures are designed to prevent, and is the primary reason they are constitutionally acceptable.

*Elsmere Park Club*, 542 F.3d at 418 (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999)).

Ultimately, "'where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist … [,] the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion.'" *Id*. ("Thus, in analyzing the Town's decision to condemn summarily the apartments, we look to whether there was 'competent evidence' supporting the reasonable belief that the mold situation presented an 'emergency,' and to whether the Town's actions were otherwise 'arbitrary' or an 'abuse of discretion'").

Here, the City of Wilkes-Barre Code of Ordinances contemplates the emergency treatment of unsafe buildings, providing:[7]

> (a) *Removal or repair of buildings.* Whenever any building, structure or part thereof or appurtenances thereto shall have been declared dangerous or unsafe by the building inspector or his designee or the fire inspector, the building shall, unless made safe and so certified by the building inspector, be demolished, taken down or removed.
>
> . . .
>
> (d) *Emergency work.* In case there shall be, in the opinion of the building inspector's office, actual and immediate danger of failure or collapse of a building or structure or any part thereof so as to endanger life or property, the building inspector shall cause the necessary work to be done to render the building or structure, or part thereof, temporarily safe, whether the procedure described in this section has been instituted or not.

Code of Ordinances City of Wilkes-Barre, Pennsylvania, Buildings and Building Regulations, §§ 7-25(a), 7-25(d).

Upon review of the statements of material facts submitted by the parties, summary judgment for either Plaintiffs or Defendants is inappropriate, as the record presents fundamental factual disputes that go to the core of whether a bona fide emergency existed which would justify the actions of Mr. Kratz and the City of Wilkes-Barre in their decision to demolish the property in question. Namely, the parties dispute: (1) the actual condition of

---

[7] Section 7-25(b), *supra* pp. 14–15 n. 6, sets forth procedures regarding notice to the owner or other person having an interest in the property as to its dangerous or unsafe condition, together with the building inspector's authority to issue an order that the building be made safe or secure or removed within five working days after notice has been issued.

Ms. Deiter's home following the fire, and (2) whether Mr. Kratz made a fully informed

decision when he called for the emergency demolition.

*1. The Condition of Ms. Deiter's Home After the Fire*

First, the parties strongly disagree as to the condition of Ms. Deiter's home following

the fire.  Plaintiffs point to the Fire Report prepared by Assistant Fire Chief John Ostrum,

which notes that the firefighters were "able to get control of the fire which prevented the fire

spreading to the other side of the double block."  (Pl.'s Ex. 45, Report of John Ostrum, at 1).

Plaintiffs further claim that when Ms. Deiter arrived at the scene of the fire, the Wilkes-Barre

City Fire Chief told her "everything is, you know, looking pretty good.  You know, it's not that

bad . . . The good thing is you have a fire wall in between . . . The other half [the left side,

where Mr. Deiter lived], you know, shouldn't have smoke damage or anything like that."[8]

(Doc. 99 at ¶ 8; Pl.'s Ex. A, Dep. of Melinda Deiter, at 81:18-23).  Defendants, on the other

hand, deny that the City Fire Chief, Jay Delaney, was of the view that the house was "not

that bad."  (Doc. 112 at ¶ 9).  Defendants instead point to a November 16, 2015 email from

Fire Chief Delaney to Butch Frati, wherein Fire Chief Delaney expresses his agreement with

Mr. Frati's statement that the property needed to be demolished, stating "I would fully

support that.  We have pictures from the interior where structural members not only burned

---

[8] Defendants deny the statements from the Fire Chief quoted in Plaintiffs' Statement of Undisputed Material Facts as inadmissible hearsay.  However, it is well settled that hearsay statements may be considered on a motion for summary judgment if they are capable of admission at trial.  *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2. (3d Cir. 2000) (citations omitted).

but are gone." (*Id*; Def.'s Ex. R, Nov. 16, 2015 email from Fire Chief Jay Delaney to Butch Frati, at 2).

The parties also dispute whether Ms. Deiter's home was structurally sound following the fire. Defendants point to the conclusion of the structural engineer, Vincent A. Griffin, P.E. of E.D. Pons and Associates, who found, in part, that there was "significant structural damage to the back half of the structure," and that Ms. Deiter's home was "structurally unsafe for any form of occupancy." (Def.'s Ex. M, Structural Engineering Report of Vincent A. Griffin, P.E., at 3–4). However, as Plaintiffs point out, Mr. Griffin's report "recommend[ed] that the building be condemned for demolition," not that it to be subject to an *emergency* demolition. (*Id*. at 4). Further, Mr. Griffin's report states that "a partial collapse of the back portion of the structure may injure the inhabitants of the neighboring property," and that "a partial collapse or partial removal of the north half of the double block would create an unstable condition on the south side." (*Id*). Nowhere in the report does Mr. Griffin indicate that the home is in actual and immediate danger of failure or collapse, as is required by § 7-25(d) of the City of Wilkes-Barre Building Regulations for emergency work.

In contrast to the structural engineer's report, Plaintiffs point to the opinion of Mr. Zimmerman, who stated: "My view was that [the house] absolutely was structurally sound. There was not one structural support beam that was 100 percent compromised. Sure, they all took some level of fire damage but not one board was it [sic] burnt to the point where it was in two pieces." (Pl.'s Ex. D, Dep. of Richard Zimmerman, at 38:2-7). Further

compounding this factual dispute, Defendants also point to the Fire Cause/Origin Report

prepared by Assistant Chief Fire Inspector/Investigator William Sharksnas, which states that

the fire caused "*possible* structural damage." (Doc. 104 at ¶ 46; Def.'s Ex. I, Wilkes-Barre

Fire Department Cause/Origin Report, at 3) (emphasis added).

Not one of the opinions contained within the record regarding the condition and

structural integrity of Ms. Deiter's home following the fire is entirely consistent with another.

Evaluating such opinions calls for the Court to make credibility determinations, which "are

inappropriate to the legal conclusion necessary to a ruling on summary judgment."

*Doebbler*, 442 F.3d at 820.

*2. Whether Mr. Kratz Made a Fully Informed Decision to Proceed with an Emergency
Demolition*

Next, the parties disagree over whether Mr. Kratz made a fully informed decision to

condemn Ms. Deiter's home for demolition. According to the City of Wilkes-Barre Code of

Ordinances, in order to proceed as an emergency, Mr. Kratz was required to determine

whether the building presented an actual and immediate danger of failure or collapse.[9]

Defendants claim that Mr. Kratz came to his conclusion that the house required an

emergency teardown after inspecting the fire damage to the property and obtaining an

inspection from a structural engineer. (Doc. 104 at ¶¶ 50, 58, 60). However, according to

---

[9] The City of Wilkes-Barre Code of Ordinances allows for emergency work when, "in the opinion of the building inspector's office, actual and immediate danger of failure or collapse of a building or structure or any part thereof so as to endanger life or property." § 7-25(d).

Plaintiff's, Mr. Kratz's deposition testimony indicates that he did not actually inspect the fire damage, but rather "looked over the property" in a cursory fashion, and that he did not take any photos or notes. (Doc. 121 at ¶ 50; Pl.'s Ex. B, Dep. of Frank Kratz, Doc. 100-25 at 12:8-9, 13:23-25, 14:1).

A review of the record also reveals a dispute regarding the timing of Mr. Kratz's visit and alleged inspection of Ms. Deiter's property following the fire. During his deposition, Mr. Kratz stated that his boss, Mr. Frati, called him while he was at work to tell him "there was a fire on Marlboro Street" and to "[g]o down and take a look at it." (Dep. of Kratz, Doc. 100-25 at 10:13-24, 11:7-10). Mr. Kratz was unsure of whether this phone call occurred the same day as the fire or the day after, but he stated that after the phone call he immediately left work and went over to the scene. (Dep. of Kratz at 10:19-21, 11:20-22). However, the record also contains a Sunday, November 15, 2015 4:59 p.m. email from Fire Chief Delaney to the Mayor of Wilkes-Barre and Mr. Frati describing the fire that took place at Ms. Deiter's property earlier that day. (Def.'s Ex. L, November 15, 2015 Email from Butch Frati to Frank Kratz, at 2). Mr. Frati forwarded this email to Mr. Kratz a few minutes later, at 5:04 p.m., and asked him to "check on this first thing tomorrow." (*Id*). Thus, it is unclear when Mr. Kratz first visited Ms. Deiter's property following the fire.

The record also presents a factual dispute regarding whether Mr. Kratz considered the conclusion of the structural engineer's inspection before calling for the emergency demolition of Ms. Deiter's home. During his deposition, Mr. Kratz stated that he called E.D.

Pons and Associates during his initial visit to the property, which was either on Sunday, November 15 or Monday, November 16, to see if they had someone available to give him a determination on the structure. (Dep. of Kratz, at 14:7-10). Mr. Kratz further stated that a structural engineer arrived later that day and inspected the building. (*Id*. at 14:11-1, 18:2-18). Kratz also stated that the engineer told him, on site, that the building was structurally unsafe and in danger of collapse, and that he would send Mr. Kratz a report. (*Id*. at 19:19-25, 19:1-9).

However, Plaintiffs dispute the timing of the structural engineer's inspection. Plaintiffs point out that the report prepared by Vincent A. Griffin states that the date of inspection was November 18, 2015, which was the same day as the demolition. (Def.'s Ex. M, November 18, 2015 Structural Engineering Report of Vincent A. Griffin, at 3). It is undisputed that the City of Wilkes-Barre's two emergency demolition contractors, Brdaric Excavating, Inc. and Stell Enterprises, Inc., each submitted their proposals to demolish the property two days before the demolition, on November 16, 2015. (Def. Ex. N, Demolition Proposal of Brdaric Evcavating, Inc., at 2; Def. Ex. O, Demolition Proposal of Stell Enterprises, at 3). It is further undisputed that Mr. Kratz authorized an email to be sent to Stell Enterprises the day before the demolition, on November 17, 2015. (Def. Ex. P, November 17, 2015 Email from Frank Kratz to Robert Stella, at 2). Thus, whether Mr. Kratz considered the structural engineer's final conclusion regarding Ms. Deiter's home prior to authorizing its demolition presents a disputed matter for trial.

Finally, it is undisputed that Mr. Kratz had full authority within the City of Wilkes-Barre to deem property unsafe and to call for its demolition. (Kratz. Dep. at 136:25, 137, 138:1-13). The Supreme Court has provided the following with respect to a municipality's liability under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978):

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances. To hold a municipality liable for actions ordered by such officers exercising their policymaking authority is no more an application of the theory of respondeat superior than was holding the municipalities liable for the decisions of the City Councils in Owen and Newport. In each case municipal liability attached to a single decision to take unlawful action made by municipal policymakers. We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) (internal citations omitted).

Thus, the Court will not grant summary judgment for or against either Plaintiffs or Defendants, as it is heavily disputed whether the circumstances here presented an emergency that would allow for Defendants to summarily order the demolition of Plaintiffs'

23

home.[10]  In other words, the factual disputes in this matter, *i.e.*, whether competent

evidence supports a reasonable belief that an emergency did in fact exist, or whether Mr.

Kratz's invocation of emergency procedure was arbitrary or amounted to an abuse of

discretion, *Elsmere Park Club*, 542 F.3d at 418, are not appropriate for disposition on

summary judgment.  Therefore, summary judgment on Plaintiffs' procedural due process

claim must be denied for both Plaintiffs and Defendants.[11]

## B. Taking Claim

Plaintiffs next argue that Defendants effected a taking of Plaintiffs' property without

compensation in violation of the Fifth and Fourteenth Amendments of the United States

Constitution.[12]  (*See* Doc. 101 at 9–10).  In support of their Motion for Summary Judgment,

Plaintiffs assert that "[t]here is no issue of material fact relating to Kratz's and Wilkes-Barre

City's taking of the property."  (Doc. 101 at 10).  In two sentences, Plaintiffs argue that they

---

[10] As discussed in the text, if Defendants were required to provide Plaintiffs with a pre-deprivation hearing, "then no amount of postdeprivation process could cure the [City]'s initial failure to provide a hearing."  *Elsmere Park Club*, 542 F.3d at 417.

[11] The record also presents a factual dispute regarding whether Ms. Deiter and Mr. Kratz ever spoke prior to the demolition of Ms. Deiter's home.  Ms. Deiter claims that she obtained his phone number the day of the fire, and subsequently called him multiple times and left several messages.  (Melinda Deiter Dep. at 87:3-16, 93).  Ms. Deiter also claims that Kratz eventually answered her call on the day of the demolition, and that they had a brief conversation.  (*Id*. at 94).  Mr. Kratz denies ever speaking to Ms. Deiter or receiving any of her phone calls.  (Kratz Dep. at 20:15-25, 21:1-16).  While it is unclear whether it is material to know if Mr. Kratz and Ms. Deiter ever spoke on the phone prior to the demolition at this stage in the analysis, this further highlights that the record is replete with factual disputes at every turn.

[12] As discussed, supra p. 10 n. 3, Plaintiffs have alleged a Fifth Amendment taking claim as incorporated to the states through the Fourteenth Amendment.  See *Knick,* 139 S. Ct. at 2172 ("someone whose property has been taken by a local government has a claim under § 1983 for a 'deprivation of [a] right[ ] . . . secured by the Constitution' that he may bring upon the taking in federal court").  This is distinct from a statutory claim of eminent domain, which Plaintiffs have not alleged in this matter.

"have demonstrated that Wilkes-Barre City took their home on Marlborough Avenue without receiving any monetary compensation in return," and that they "have been totally deprived of all beneficial use of the property – the land is too narrow to build on and therefore has negative value." (Doc. 101 at 10). Conversely, Defendants argue that they are entitled to summary judgment on Plaintiffs' Fifth Amendment taking claim for three reasons: (1) demolition of Ms. Deiter's property constituted a non-compensable exercise of police powers, (2) the claim fails as a matter of law because Ms. Deiter maintains ownership and a possessory interest in the property, and (3) Mr. Kratz is entitled to qualified immunity.[13] (*See* Doc. 104 at 38–46).

---

[13] Defendants' qualified immunity argument is without merit. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Whether a government official is entitled to qualified immunity requires a two-step inquiry: "First, we ask whether the facts – taken in the light most favorable to the nonmoving party – show that a government official violated a constitutional right. Second, we ask whether that right was clearly established at the time of the official's actions." *Kane v. Barger*, 902 F.3d 185, 191–92 (3d Cir. 2018) (internal citations and quotation markers omitted).

Citing to recent Supreme Court precent *Knick v. Township of Scott*, ---U.S.---, 139 S. Ct. 2162, 2167 (2019), Defendants argue that "[i]t was objectively reasonable in November 2015, given the binding Supreme Court precedent clearly established at the time, the existence of state-litigation remedies for inverse condemnation, and its preclusive effect in federal court, that the demolition of the Property did not constitute an actionable violation of the Takings Clause of the Fifth Amendment." (Doc. 103 at 48). However, The *Knick* decision only altered the landscape of Fifth Amendment takings claims to the extent that exhaustion of state court remedies is no longer a pre-requisite to bringing such claims in federal court. Knick, 139 S. Ct. at 2171. As the parties have previously briefed the Court on the *Knick* decision, (*see* Docs. 62, 63, 64), and as the Court has specifically addressed the impact of *Knick* on Plaintiff's claims in this matter (*see* Doc. 67), Defendants should understand that *Knick* had no impact on whether the underlying right to just compensation when the government takes private property for public use, as is explicitly stated in the Fifth Amendment of the United States Constitution, was clearly established as of 2015 for purposes of qualified immunity.

The Court finds that summary judgment must be denied for both Plaintiffs and Defendants on the Fifth Amendment taking claim, as the current record raises two key factual disputes: (1) whether Defendants demolition of Ms. Detier was a valid exercise of Defendants' police power, and (2) whether Ms. Deiter was deprived of all beneficial use of her land.

The Takings Clause of the Fifth Amendment provides: "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Township of Scott*, ---U.S.---, 139 S. Ct. 2162, 2167 (2019). "The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Id.* at 2170.

Not all losses in property value caused by the government amount to a taking. *See Andrus v. Allard*, 444 U.S. 51, 65 (1979) ("Government regulation - by definition - involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstance would effectively compel the government to regulate by purchase"). "The Takings Clause, therefore, preserves governmental power to regulate, subject only to the dictates of 'justice and fairness.'" *Id.* (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978)).

There is no single precise formula for determining when a government action is properly characterized as a taking in violation of the Fifth Amendment. *Keystone Bituminous Coal Assn. v. Duncan*, 771 F.2d 707, 712 (3d Cir. 1985). Thus, "[t]he inquiry turns on the particular circumstances of each case." *Id.* (citing *United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958). However, "[t]he [Supreme Court] cases suggest that there are three relevant fields of inquiry: first, whether the government's action entails a physical invasion of the plaintiff's property; second, the extent to which it results in a diminution in the value of plaintiff's property; and third, the degree to which it interferes with plaintiff's reasonable, distinct, investment-backed expectations." *Duncan*, 771 F.2d at 715 (citing *Andrus*, 444 U.S. at 65–66; *Penn Central*, 438 U.S. at 124). Courts within this Circuit have found that "a municipality may, in the exercise of its police power, without compensation destroy a building or structure that is a menace to the public safety or welfare, or require the owners to demolish the dangerous piece of property." *In re 106 North Walnut, LLC*, 447 Fed. App'x 305 at 309 (3d Cir. 2011); *see also Fisher v. Pratt*, No. 19-273, 2020 WL 773262, at *5 (D. N.J. Feb. 18, 2020).

Defendants argue, in part, that the demolition of Ms. Detier's home constituted an exercise of police power, which they claim does not constitute a compensable taking. (*See* Doc. 103 at 38–43). More specifically, Defendants assert that "the conditions on which the City's codified police powers were exercised objectively existed, were verified by a third party engineering firm, and were separately supported by the Fire Chief," and that "[r]azing

the Property was a proper exercise of the City's codified police powers, utilized to abate a dangerous condition and avoid a partial collapse and potential injury to the inhabitants of the neighboring property." (*Id*. at 41, 42–43).

Defendants cite to *National Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57, 63 (3d Cir. 2013) for the proposition that "[f]or instance, 'orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee ... have long been considered permissible exercises of the police power," which do not entitle the individuals affected to compensation." (citing *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 335 (2002)). However, as discussed above, whether Defendants were presented with an emergency situation sufficient to justify the demolition of Ms. Deiter's fire-damaged home, specifically those facts regarding the condition of Ms. Deiter's home, and whether Mr. Kratz properly considered the conclusion of the structural engineer prior to calling for demolition, is highly disputed. Thus, Defendant has not shown the absence of undisputed material facts on this issue, and accordingly, whether the demolition of Ms. Deiter's home constituted a valid exercise of police power is an issue for trial.

Further, Defendants argue that "Ms. Deiter's Fifth Amendment Takings Clause claim fails as a mater of law because Ms. Deiter maintains an ownership and possessory interest in the property." (Doc. 103 at 43). In support of this argument, Defendants cite to the unpublished Third Circuit opinion *Munoz v. City of Union City*, 481 Fed. App'x 754 (3d Cir.

2012). In *Munoz*, the Circuit Court cites to *Andrus*[14] to support the proposition that "[a] Takings Clause claim cannot lie where the plaintiff was not deprived of all beneficial uses of his property." *Munoz v. City of Union City*, 481 Fed. App'x 754, 759 (3d Cir. 2012); *see also Duffy v. Kent County Levy Court*, 591 Fed. App'x 41, 44 (3d Cir. 2014)). The Court in *Munoz* ultimately held that the plaintiff did not establishing a Takings Clause violation, finding that he retained a possessory interest in the property, and that he was "still entitled to put the property to any number of beneficial uses. The record reflect[ed] that [the plaintiff] simply lack[ed] sufficient funds to do so." *Id.* Here, however, a question remains as to whether Ms. Deiter was deprived of all beneficial uses of her property. Plaintiffs claim that Ms. Deiter's property has a negative value following the fire, as Ms. Deiter is still required to pay taxes, sewer, and recycling fees, despite the property being too narrow to build on. (Doc. 99 at ¶ 49; Pl.'s Ex. 44, Receipts for Taxes and Fees). Defendants, on the other hand, point to the declaration of William C. Harris, the Director of Planning and Zoning/Zoning Officer for the City of Wilkes-Barre, which states that Ms. Deiter's "[p]roperty is a buildable lot subject to SECTION 805 of the Wilkes-Barre City Zoning Ordinance File of Council 18 of 2012." (Def.'s Ex. W, Declaration of William C. Harris, at ¶ 3). However,

---

[14] In *Andrus*, the Court found that "the denial of one traditional property right does not always amount to a taking . . . where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus*, 444 U.S. at 65–66. The Court ultimately held that the government action at issue did not effect a taking in violation of the Fifth Amendment, noting that it was "crucial that appellees retain[ed] the rights to possess and transport their property," and that it was unclear that appellees would be unable to derive economic benefit from the property. *Id.* at 66.

Plaintiffs argue that there is nothing in Section 805 of the Zoning Ordinance that relates to the dimensions or square footage of the lot. (Plaintiff's Brief in Opposition to Defendants Motion for Summary Judgment, Doc. 123 at 38).

Therefore, the Court will deny both parties' motions for summary judgment on the Plaintiff's taking claim, as the record presents factual disputes that are material to determining whether Defendants' demolition of Ms. Deiter's home constituted a taking within the meaning of the Fifth Amendment.

## C. Unreasonable Seizure of Property Claim

Next, Plaintiffs argue that, pursuant to 42 U.S.C. § 1983, Defendants seized their property in violation of the Fourth Amendment of the United States Constitution.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment's protections apply in both the civil and criminal contexts, and regardless of whether a "search" within the meaning of the Amendment has taken place. *Soldal v. Cook County, Ill.*, 506 U.S. 56, 67 (1992).

In the context of the Fourth Amendment, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Courts within this Circuit have found that the demolition of a person's property constitutes a seizure within the meaning of the

Fourth Amendment. *See Fisher v. Pratt*, No. 19-273, 2020 WL 773262, at \*7 (E.D. Pa. Feb. 18, 2020) ("Demolition of a partially collapsed structure located on Plaintiff's property constitutes a seizure within the meaning of the Fourth Amendment); *see also Gariffo Real Estate Holdings Co., Inc. v. City of Philadelphia*, No. 05-5153, 2007 WL 1410607, at \*4 (E.D. Pa. May 11, 2007) ("The City's demolition of the partially collapsed structure located on Plaintiff's property constitutes a seizure within the meaning of the Fourth Amendment").

When a structure is seized, "'reasonableness is still the ultimate standard' under the Fourth Amendment." *Soldal*, 506 U.S. at 71. Thus, in order to prevail on Fourth Amendment claim regarding seized property, a plaintiff must prove that the government's actions were unreasonable. *See id*. at 61–62 ("We fail to see how being unceremoniously dispossessed of one's home . . . can be viewed as anything but a seizure invoking the protection of the Fourth Amendment. Whether the Amendment was in fact violated is, of course, a different question that requires determining if the seizure was reasonable.")

Plaintiffs argument in favor summary judgment rests on the assumption that because "there is no issue of material fact relating to whether an official's demolition was made arbitrarily or amounted to an abuse of discretion, there also cannot be an issue of material fact relating to whether the government's seizure of property was unreasonable." (Doc. 101 at 12). Plaintiff provides no further analysis on the Fourth Amendment issue. In their brief supporting brief, Defendants argue that "[f]ar from acting arbitrarily in this case, the City

followed the published procedures set forth in its Building Regulations and acted reasonably under the circumstances."  (Doc. 103 at 38).

The factual disputes discussed *supra*, Section IV.A, go to the heart of whether Defendants seizure of Plaintiffs' property was reasonable under the Fourth Amendment.  As discussed above, material disputes of fact as to whether competent evidence existed to justify Defendants emergency demolition of Ms. Deiter's home, or whether Defendants acted arbitrarily remain and must be tried.  Thus, summary judgment on Plaintiffs' Fourth Amendment seizure claim must be denied for both parties, as disputes of fact are within the province of the jury, not the Court.

### D. Conversion Claim

Finally, Plaintiffs argue that Defendant Kratz committed the intentional tort of conversion when he ordered Ms. Deiter's home to be demolished.  (*See* Doc. 101 at 15).

"[U]nder Pennsylvania law, conversion is the 'deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification.'"  *Universal Premium Acceptance Corp. v. York Bank & Tr. Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (quoting *Cenna v. United States,* 402 F.2d 168, 170 (3d Cir.1968)).  "Conversion may be committed by [u]nreasonably withholding possession from one who has the right to it."  *Mifflinburg Tel., Inc. v. Criswell*, 277 F. Supp. 3d 750, 794 (M.D. Pa. 2017) (citing *Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721 (1964)).  "[R]eal property cannot be the subject of an action for

conversion." *Sterling v. Redevelopment Authority of City of Philadelphia*, 836 F. Supp. 2d 251, 270 (E.D. Pa. 2011) (citing 18 Am.Jur.2d *Conversion* § 15; 90 C.J.S. *Trover and Conversion* § 17; cf. *Norriton East Realty Corp. v. Central-Penn. Nat'l Bank*, 435 Pa. 57, 254 A.2d 637 (1969)).

In less than a page of their supporting brief, Plaintiffs argue that "[t]here is no issue of material fact relating to Kratz's and Wilkes-Barre City's conversion of plaintiff's property." (Doc. 101 at 14). Plaintiffs put forward one sentence of analysis, claiming "Kratz deprived plaintiffs of the right or use of John Deiter's lifetime of personal possessions when he contracted on behalf of Wilkes-Barre City to declare that all salvage was to become the property of demolition contractor SEI." (*Id*). Plaintiffs have not pointed to any specific factual allegations within the record to support their assertion that they are entitled to summary judgment on the conversion claim. As such, Plaintiffs have failed to meet their burden on summary judgment of showing the absence of a genuine dispute as to any material fact. *See Celotex Corp.,* 477 U.S. at 323.

In their Motion for Summary Judgment, Defendants generally state that they are "challenging the amended complaint (Doc. 22) of Plaintiffs." (Doc. 102 at 1). However, Defendants put forward no argument in their supporting brief claiming entitlement to summary judgment on Plaintiff's conversion claim. Rather, in their Brief in Opposition to Plaintiffs' Motion for Summary Judgment, Defendants argue that "because Defendants are

entitled to summary judgment on the federal law claims, this Court should decline to exercise supplemental jurisdiction over the state law claim. (Doc. 113 at 44).

Therefore, to the extent that the parties request summary judgment on Plaintiffs' state law conversion claim, both of the parties' Motions will be denied.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs' and Defendants' cross-motions for summary judgment will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge